412 S.E.2d 733

**John E. MITCHELL, Petitioner Below, Appellee,**

v.

**Jane L. CLINE, Commissioner of the Department of Motor Vehicles, Respondent Below, Appellant.**

No. 20126.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 11, 1991.

Decided Dec. 12, 1991.

Christopher J. Paull, Cipriani & Paull, Wellsburg, for appellee.

Andrew F. Tarr, Asst. Atty. Gen., Charleston, for appellant.

PER CURIAM:

This is an appeal by the Commissioner of the West Virginia Department of Motor Vehicles from an order of the Circuit Court of Brooke County which reversed a decision of the Commissioner revoking John E. Mitchell's driver's license. In reversing the Commissioner's decision to revoke the license, the circuit court ruled that the evidence adduced in the case failed to establish a basis for revocation as required by *W.Va.Code*, 17C–5–1 *et seq.* On appeal, the Commissioner takes issue with the court's interpretation of the statute and claims that an appropriate statutory basis for revocation was established and that the revocation should be reinstated. After reviewing the record and the questions presented, this Court agrees with the Commissioner and reverses the decision of the Circuit Court of Brooke County.

At approximately 10:40 p.m. on October 4, 1989, Deputy Sheriff Kevin L. Heck of the Brooke County Sheriff's Office stopped a vehicle which was weaving from side to side on West Virginia Route 2 in Brooke County. The vehicle was being driven by John E. Mitchell.

After stopping the vehicle, Deputy Heck detected the odor of alcohol on Mr. Mitchell and asked him to step out of the vehicle. Mr. Mitchell complied, and Deputy Heck administered three field sobriety tests which, according to the deputy, Mr. Mitchell failed.

After the completion of the sobriety tests, Deputy Heck arrested Mr. Mitchell for driving under the influence of alcohol and transported him to the Brooke County Sheriff's Department for administration of a secondary chemical test to determine the level of Mr. Mitchell's blood alcohol.

At the time of Mr. Mitchell's arrest, the present *W. Va. Code*, 17C–5–4, delineated the procedure to be followed to determine the blood alcohol content of the blood of an individual arrested for driving under the influence of alcohol. That statute provides, in relevant part:

> Any person who drives a motor vehicle in this state shall be deemed to have given his consent by the operation thereof, subject to the provisions of this article, to a preliminary breath analysis and a secondary chemical test of either his blood, breath or urine for the purposes of determining the alcoholic content of his blood ... A secondary test of blood, breath or urine shall be incidental to a lawful arrest and shall be administered at the direction of the arresting law-enforcement officer ... The law-enforcement agency by which such law-enforcement officer is employed shall designate which one of the aforesaid secondary tests shall be administered: Provided, That if the test so designated is a blood test and the person so arrested refuses to submit to such blood test, then the law-enforcement officer making such arrest shall designate in lieu thereof, either a breath or urine test to be administered, and notwithstanding the provisions of section seven [§ 17C–5–7] of this article, such refusal to submit to a blood test only shall not result in the revocation of the arrested person's license to operate a motor vehicle in this state.

Another statutory section, *W. Va. Code*, 17C–5–7, provides that while an individual may refuse to submit to a secondary test, such refusal may serve as the basis for revocation of the individual's driver's license:

> (a) If any person under arrest as specified in section four [§ 17C–5–4] of this article refuses to submit to any secondary chemical test, the tests shall not be given: Provided, That prior to such refusal, the person is given a written statement advising him that his refusal to submit to the secondary test finally designated will result in the revocation of his license to operate a motor vehicle in this state for a period of at least one year and up to life.... The officer shall within forty-eight hours of such refusal, sign and submit to the commissioner of motor vehicles a written statement of the officer that (1) he had reasonable grounds to believe such person had been driving a motor vehicle in this state while under the influence of alcohol, controlled substances or drugs; (2) such person was lawfully placed under arrest for an offense relating to driving a motor vehicle in this state while under the influence of alcohol, controlled substances or drugs; (3) such person refused to submit to the secondary chemical test finally designated in the manner provided in section four [§ 17C–5–4] of this article; and (4) such person was given a written statement advising him that his license to operate a motor vehicle in this state would be revoked for a period of at least one year and up to life if he refused to submit to the secondary test finally designated in the manner provided in section four [§ 17C–5–4] of this article ... For the first refusal to submit to the designated secondary chemical test, the commissioner shall make and enter an order revoking such person's license to operate a motor vehicle in this state for a period of one year. If the commissioner has previously revoked the person's license under the provisions of this section, the commissioner shall, for the refusal to submit to the designated secondary chemical test, make and enter an order revoking such person's license to operate a motor vehicle in this state for a period of ten years....

At the time Mr. Mitchell was arrested, the Brooke County Sheriff's Department

had officially designated a Breathalyzer 1000 machine test as the secondary chemical test to be used for the purposes of *W.Va.Code*, 17C–5–1 *et seq.* Although the Breathalyzer 1000 test was the official designated test, prior to the time of Mr. Mitchell's arrest, the Brooke County Sheriff's Department had replaced it with an Intoxilyzer 5000 machine. The Sheriff's Department had not, however, officially designated the Intoxilyzer 5000 machine test as the test to be used for the purposes of *W.Va. Code*, 17C–5–1, *et seq.*

After Mr. Mitchell was taken to the Sheriff's Department for the secondary test, he was offered a test on the Intoxilyzer 5000 machine, which he refused to take. He, however, was not offered a test on the "officially designated" Breathalyzer 1000 machine.

Following Mr. Mitchell's refusal to take the Intoxilyzer 5000 test, the arresting officer signed and submitted a certificate to the Commissioner of Motor Vehicles indicating that Mr. Mitchell had failed to submit to tests as required by *W.Va.Code*, 17C–5–1 *et seq.*

After receiving the arresting officer's statement, the Commissioner of the Department of Motor Vehicles issued an initial revocation order. An administrative hearing was later held in the matter, and on June 26, 1990, the Commissioner issued a final revocation order which revoked Mr. Mitchell's license for one year.

Mr. Mitchell appealed the revocation of his driver's license to the Circuit Court of Brooke County. In his petition, he argued that the arresting officer had failed to prove that he had refused to take the officially designated secondary chemical test, that is, the Breathalyzer 1000 test, and that under the circumstances the requirements of *W.Va.Code*, 17C–5–7, to support the revocation of a driver's license had not been met.

After taking the matter under consideration, the circuit court, on August 30, 1990, issued a memorandum opinion in which the court found in favor of Mr. Mitchell. In effect, the court found that the officially designated test was a Breathalyzer 1000 test and that that test had not been offered

to Mr. Mitchell. The court also, in effect, found that the refusal of Mr. Mitchell to take a test on the Intoxilyzer 5000 machine did not meet the statutory requirement that he refused to submit to the secondary chemical test "finally designated" such as would support the revocation of his license. Under the circumstances, the court found that the factors required by *W.Va.Code*, 17C–5–7, were not present and adequate to support the revocation of Mr. Mitchell's license.

On September 13, 1990, the court issued a final order. In that final order the court reversed the Commissioner's decision and ordered that Mr. Mitchell's license be immediately reinstated. The court also assessed $70.00 in court costs against the Commissioner.

In the present proceeding, the Commissioner contends that the court erred in reversing the decision revoking Mr. Mitchell's license. The Commissioner in essence argues that the real statutory requirement is that an accused person refused to take a secondary chemical test and in effect argues that the failure to take a test on a particular machine specifically designated is irrelevant to the real question in the case. The appellant also argues that where a driver refuses to take a secondary chemical test pursuant to Code section, as a matter of law the driver's license can be revoked.

■ It has been rather consistently recognized by this Court that the primary object in construing a statute is to ascertain and give effect to the intention of the Legislature. *Gant v. Waggy*, 180 W.Va. 481, 377 S.E.2d 473 (1988); *State ex rel. Simpkins v. Harvey*, 172 W.Va. 312, 305 S.E.2d 268 (1983); *Wooddell v. Dailey*, 160 W.Va. 65, 230 S.E.2d 466 (1976); *State ex rel. Holbert v. Robinson*, 134 W.Va. 524, 59 S.E.2d 884 (1950). In somewhat more expansive language, the Court explained in syllabus point 1 of *State ex rel. Simpkins v. Harvey, supra:*

"A statute should be so read and applied as to make it accord with the spirit, purposes and objects of the general system of law of which it is intended to form a part; it being presumed that the legislators who drafted and passed it were fa-

miliar with all existing law, applicable to the subject matter, whether constitutional, statutory or common, and intended the statute to harmonize completely with the same and aid in the effectuation of the general purpose and design thereof, if its terms are consistent therewith." Syllabus Point 5, *State v. Snyder*, 64 W.Va. 659, 63 S.E. 385 (1908).

The Court has also recognized in syllabus point 1 of *State ex rel. Holbert v. Robinson, supra,* that:

A statute is enacted as a whole with a general purpose and intent, and each part should be considered in connection with every other part to produce a harmonious whole. Words and clauses should be given a meaning which harmonizes with the subject matter and the general purpose of the statute. The general intention is the key to the whole and the interpretation of the whole controls the interpretation of its parts.

The overall purpose of the statutes involved in the present case, which are often referred to as the implied consent laws, has historically been viewed as an effort on the part of the State to decrease the damage to persons and property arising from drivers operating motor vehicles while under the influence of intoxicating liquor. *Jordan v. Roberts,* 161 W.Va. 750, 246 S.E.2d 259 (1978).

In examining *W.Va.Code,* 17C–5–4, the statute discussing secondary chemical tests to which drivers impliedly consent, the Court notes that in the first part of the statute, the language states that the "secondary chemical test" shall be either of the charged person's "blood, breath or urine for the purpose of determining the alcoholic content of his blood." In discussing the designation of the test, the statute says:

The law-enforcement agency by which such law-enforcement officer is employed shall designate which one of the aforesaid secondary tests shall be administered: Provided, That if the test so designated is a blood test and the person so arrested refuses to submit to such blood test, then the law-enforcement officer

making such arrest shall designate in lieu thereof, either a breath or urine test to be administered ...

The Court can find nothing in the statute which makes reference to the use, or certification, of any particular machine or particular blood, breath, or urine test to be used to measure an individual's blood alcohol content. Instead, the Court finds, as previously indicated, that the statute refers to a generic "blood, breath or urine" test. Also, as previously indicated, in one proviso the statute refers to "a blood test" as "one of the aforesaid secondary tests."

Given the fact that particular test technology is rapidly developing, and the further fact that the problem of intoxicated drivers is a relatively static one, this Court cannot believe that it was the intent of the Legislature to impose particular test or machine restrictions on law enforcement officers in the enforcement of the drunk-driving laws. It was not the intent of the Legislature to afford drunk drivers with technical loopholes to afford them a method of escaping the effect of the laws. Rather, the Court believes that it was the purpose of the Legislature to afford police officers an objective, scientific, and rational basis for distinguishing intoxicated from non-intoxicated drivers, and the Legislature contemplated that that objective could be accomplished by any number of scientifically-accepted blood, breath, or urine tests. The key factor is not whether the particular test is designated, but whether a scientifically established test involving breath, blood, or urine is designated and employed.[1]

In view of this, the Court concludes that in the present case the fact that an official certificate indicated that a Breathalyzer 1000 machine would be used to determine alcohol content did not preclude the use of an Intoxilyzer 5000 machine where the Intoxilyzer 5000 machine was a generally recognized, scientifically accurate testing machine employing breath samples which would accomplish the same purposes.

Under the circumstances, this Court concludes that by refusing to take the Intoxi-

---

1. The Court sees a rational basis for restricting tests to breath, blood, or urine since the taking

of samples for those tests is relatively non-inva-

lyzer 5000 test offered, as a recognized breath test, Mr. Mitchell, in effect, fell within the category of those who "shall refuse to submit to any secondary test" as provided by *W. Va. Code*, 17C–5–7, and that under the circumstances the Commissioner of the Department of Motor Vehicles properly could, and properly did, revoke Mr. Mitchell's driver's license. The Court also believes that the Circuit Court of Brooke County erred in reversing the Commissioner's decision.

For the reasons stated, the judgment of the Circuit Court of Brooke County is reversed and this case is remanded with directions that Mr. Mitchell's driver's license be revoked in accordance with the provisions of *W. Va. Code*, 17C–5–7.

Reversed and remanded with directions.

sive, is quick, and can be done at a minimum of inconvenience to the arrested individual.

Where samples are actually taken and tested, the procedure must, of course, comport with the requirements established in *State v. Hood*, 155 W.Va. 337, 184 S.E.2d 334 (1971), and elsewhere, to insure that the results are scientifically accurate.